# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW MEXICO

**KATHLEEN BURKE,**

    **Plaintiff,**

v.                        No. 17-cv-926 JCH-SCY

**TSG RESOURCES, INC.,**
**d/b/a/ SCHUMACHER CLINICAL**
**PARTNERS,**

    **Defendant.**

## MEMORANDUM OPINION AND ORDER

On May 7, 2018, Defendant filed a Motion for Summary Judgment and Memorandum in Support (ECF No. 24). The Court, having considered the motion, briefs, evidence, argument, relevant law, and otherwise being fully advised, concludes that the motion for summary judgment should be granted and the case dismissed.

### I.    FACTUAL BACKGROUND

The record, viewed in the light most favorable to Plaintiff Kathleen Burke ("Plaintiff" or "Burke") and drawing all inferences in her favor, shows the following.

Plaintiff began working for Hospital Physician Partners ("HPP") in 2009 as a medical scribe in Albuquerque, New Mexico. Def.'s Mot., Undisputed Fact ("Def.'s UF") ¶ 1, ECF No. 24. When Plaintiff began working for HPP, she provided medical scribing services at Lovelace's downtown hospital and her supervisor was Johnathon Hartnett. *Id.* UF ¶¶ 2-3. Mr. Hartnett was in charge of recruiting new scribes to HPP; he recruited Plaintiff to HPP; and during the negotiations, he agreed orally that she would not work night shifts. Hartnett Aff. ¶¶ 2-3, ECF No. 28-2. Plaintiff was only willing to take the job with the understanding she would not work nights. Burke Dep.

31:16-22, ECF No. 28-1. While Mr. Hartnett worked at HPP, he never assigned Plaintiff to work a night shift. Hartnett Aff. ¶ 4, ECF No. 28-2.

HPP later expanded their scribing services to additional Lovelace facilities. Def.'s UF ¶ 5, ECF No. 24. David Wright eventually took over Mr. Hartnett's position as Plaintiff's supervisor. *Id.* ¶ 6. On November 7, 2013, Mr. Wright sent an email to Plaintiff and two other scribes containing the following information:

> The scribe team needs to adapt and become more flexible to better serve the needs of our providers and the hospitals in which they work.
>
> As of 12/1/2013, all scribe team members may be scheduled to work at any of the hospitals within the Lovelace system. As support of our physician partners is a 24 hour / 7 day commitment, you will be expected to be available to be scheduled to work day, evening, or night shifts. I will continue to be as flexible as I can in scheduling shifts, but the needs of the hospitals must take priority.

Def.'s Ex. 3, ECF No. 24-1. Because of Plaintiff's oral agreement made with Mr. Hartnett, she believed the company policy change did not apply to her. *See* Burke Dep. 59:4-10, ECF No. 24-1.

In April 2014, Jason Lafayette took over scheduling of the scribes in Albuquerque. Def.'s UF ¶ 9, ECF No. 24. At that time, Plaintiff was the most senior scribe at the Albuquerque location. Burke Aff. ¶ 7, ECF No. 28-3. The other scribes she worked with were substantially younger than her. Burke Dep. 48:15-16, ECF No. 28-1.

Lafayette advised Plaintiff in April 2014 that scheduling of scribe coverage would be based on priority and that scribes would be expected to be available to be scheduled to work day, evening or night shifts based on the priority needs of HPP's providers. Lafayette Decl. ¶ 9, ECF No. 24-1. Lafayette made schedules for the Albuquerque scribes between April 2014 and September 2014. Def.'s UF ¶ 11, ECF No. 24. Burke only saw Lafayette in person three or four times. *Id.* ¶ 27.

When Lafayette scheduled Plaintiff for a night shift, she would inform her superiors, including Lafayette, that she had a long-standing agreement not to work nights and she would not

work the night shift. Burke Dep. 57:12-21, ECF No. 24-1; Burke Aff. ¶¶ 5 & 9, ECF No. 28-3. Plaintiff would not go to the night shift, nor would she always get coverage for it because she believed it was not her responsibility. *See* Burke Dep. 57:18-23, ECF No. 24-1. Most of the time, however, she would try to get the shift covered by contacting other scribes. Burke Aff. ¶ 9, ECF No. 28-3. Lafayette continued to schedule Plaintiff on night shifts throughout the entire time he was her supervisor. *Id.* ¶ 10. Lafayette would send Plaintiff emails telling her that she was required to work night shifts. *Id.* ¶ 11. When Plaintiff would respond that she had an agreement not to work nights, he would state that all scribes were required to work nights. *Id.* Lafayette informed Plaintiff that each employee, once scheduled for a shift, was responsible for the coverage of the assigned shift. Lafayette Decl. ¶ 12 & Ex. 4, ECF No. 24-1 at 13, 28 of 49; Burke Dep. 52:7-10, ECF No. 24-1. Plaintiff was informed that even trades were an option if she could not make a scheduled shift. *See* Def.'s Ex. 7, ECF No. 24-1 at 38 of 49.

Plaintiff does not know whether the younger scribes refused to work for their assigned shifts or whether they did not show up for their scheduled shifts. Def.'s UF ¶¶ 16-17, ECF No. 24. She also did not know whether her fellow scribes were ever scheduled for a shift during which they had something else going on. Burke Dep. 51:23-52:1, ECF No. 24-1.[1]

---

[1] Plaintiff asserts that Lafayette was willing to work around the schedules of her younger co-workers, for example for their classes, but unwilling to work around Plaintiff's schedule. *See* Burke Dep. 48:15-49:14, ECF No. 24-1. Plaintiff's knowledge concerning Lafayette's scheduling of her co-workers' schedules was based on conversations with her co-workers. *See id.* Defendant objects that Plaintiff has no personal knowledge on which to base her assertion and argues that her testimony is inadmissible hearsay upon which the Court cannot rely. The Court agrees. Plaintiff failed to submit affidavits or deposition testimony from her former co-workers. Notably, Plaintiff could not recall the names of any of the scribes with whom she talked with concerning how Lafayette handled their scheduling. *Id.* 49:1-5. Nor did she know any details about the preferences of her co-workers' schedules around which Lafayette allegedly scheduled. *See id.* 49:6-20. Because Plaintiff's testimony is hearsay and she has not otherwise submitted evidence of her assertions in a form that indicates she can produce admissible evidence at trial, the Court will not consider Plaintiff's unsupported factual assertions. *See* Fed. R. Civ. P. 56(c); *Lancaster v. Independent Sch. Dist. No. 5*, 149 F.3d 1228, 1236 (10th Cir. 1998) (noting that Rule 56 precludes use of inadmissible hearsay testimony in deposition submitted and refusing to consider plaintiff's hearsay evidence).

At some point, Plaintiff temporarily agreed to help train physicians on electronic medical records ("EMR"), despite that it was not her job, to help the company get over a rough spot when it did not have enough employees to do the training. *See* Burke Dep. 40:9-41:18, ECF No. 24-1; Burke Dep. 39:10-40:8, ECF No. 28-1. EMR trainers were paid nearly twice the amount Plaintiff was as a scribe, yet she never received an increase in pay to train doctors on the EMR system. Burke Aff. ¶ 16, ECF No. 28-3. Because she did not feel like she was adequately trained or being adequately paid to be a trainer, she sent an email to Lafayette indicating that she did not want to do EMR training anymore because it was not in her job description. *See id.*; Burke Dep. 40:9-41:24, ECF No. 24-1; Burke Dep. 50:23-51:3, ECF No. 28-1; Def.'s Ex. 4B, ECF No. 24-1 at 18-19 of 49. Plaintiff never witnessed any younger scribes being required to train doctors on the EMR system. Burke Aff. ¶ 16, ECF No. 28-3. Lafayette believed that EMR training was a logical task for Plaintiff, but she disagreed. Burke Dep. 43:11-15, ECF No. 24-1. Nevertheless, they stopped scheduling Plaintiff to train physicians on the use of the EMR. *Id.* 43:18-24.

On April 10, 2014, Lafayette set up a meeting with Burke and was vague and unwilling to give her an answer about the purpose of the meeting. *See* Burke Dep. 78:6-24, ECF No. 24-1; April 10, 2014 Email, ECF No. 24-1 at 18 of 49. Lafayette walked her into a room where he had a vice president on the phone. Burke Dep. 78:6-24, ECF No. 24-1. The meeting concerned trying to make Plaintiff work nights. *See id.* 80:9-16.

On April 16, 2014, Lafayette acted domineering, hostile, and passive-aggressive toward Plaintiff in the ER by using an angry, raised voice in the presence of staff and patients. Burke Dep. 66:20-67:18, ECF No. 28-1. She does not remember why he was angry. *Id.* 68:9-11. The encounter lasted between one and five minutes. *Id.* 69:11-13. Lafayette stood a few feet away and did not touch her. *Id.* 69:14-17.

On April 18, 2014, Lafayette exhibited hostile behavior toward Plaintiff in the ER in the presence of other employees, staff, patients, and patient families by being domineering and rude, using an angry and raised voice. Burke Dep. 71:19-73:22, ECF No. 28-1. Lafayette was angry with her while discussing a decrease in her hours by 30%. *See id.* 73:14-19. To end the conversation, Burke informed him firmly while pointing her finger at the desk that the conversation was over. *Id.* 72:25-73:5. The incident lasted between one and five minutes. Burke Dep. 74:9-10, ECF No. 24-1. Lafayette did not touch Burke and he was a few feet away. *Id.* 74:14-17.

On May 8, 2014, Lafayette gave Plaintiff a Written Notice concerning the April 18 incident, citing her for rudeness and insubordination. *See* Employee Written Notice, ECF No. 24-1 at 26-27 of 49; Burke Dep. 60:5-8, 85:3-87:4, ECF No. 28-1.[2] Four days later, on May 12, 2014, Plaintiff complained in writing about Lafayette's conduct on April 16 and April 18, asserting it created a hostile work environment. *See* Burke Aff. ¶ 17, ECF No. 28-3; Def.'s Ex. 9, ECF No. 24-1 at 41-42 of 49. Lafayette received no disciplinary action as a result of her complaint and continues to work for HPP. Pl.'s Resp. UF ¶ 50, ECF No. 28.

At some point, Lafayette tried to force Burke to sign a new job description that had additional job duties and a provision to work all shifts, including night shifts, but she noted on the new job description that she was not knowledgeable in some of the additional job duties, she did not agree to them when she was hired, and she cannot work night shifts due to her agreement with HPP. Burke Aff. ¶ 12, ECF No. 28-3 & Pl.'s Ex. D, ECF No. 28-4. On September 3, 2014, Lafayette issued Burke another Employee Written Notice, this time for absenteeism regarding four call outs and two instances of no coverage since April 10, 2014. Def.'s Ex. 8, ECF No. 24-1 at 39

---

[2] Plaintiff disputes that she was rude, and this Court views the evidence of the incident in Plaintiff's favor at this stage of the litigation. However, Plaintiff did not dispute that the written notice was issued. The Court includes that fact here to explain what occurred, not whether it was justified, and views the underlying incident in Plaintiff's favor.

of 49. Plaintiff, however, always gave her supervisor advanced notice that she would not cover her night shift, citing her verbal agreement not to work night shifts. *See* Burke Aff. ¶¶ 13-14, ECF No. 28-3.

In September 2014, Kayla Cotter took over the scheduling of Albuquerque scribes. Def.'s UF ¶ 11, ECF No. 24. Plaintiff had trained Cotter when HPP hired her. Burke Aff. ¶ 20, ECF No. 28-3. On June 15, 2015, Cotter sent an email to all scribes reminding them that night shifts were priorities, and everyone would be expected to work them. Def.'s Ex. 5, ECF No. 24-1 at 36 of 49.

On July 27, 2015, Lafayette gave Burke a Written Notice for violating company policies regarding refusing to work her scheduled night shift on July 7, 2015. Def.'s Ex. 4H, ECF No. 24-1 at 32 of 49. Plaintiff found the emails about working night shifts and weekends and the documented warnings to be harassing and designed to make her quit. *See* Burke Dep. 80:22-82:21, 85:13-19, ECF No. 24-1. Plaintiff does not claim that anyone other than Lafayette harassed her. Def.'s UF ¶ 32, ECF No. 24. Lafayette never said anything about Plaintiff's age, he did not refer to her age, and he did not make any ageist comments. *Id.* UF ¶ 33. Burke cannot recall the contents of any telephone conversations she found harassing. *Id.* ¶ 29.

Plaintiff complained on September 17, 2015, that her hours had been cut by approximately 30%. Lafayette Aff. ¶ 20 & Def.'s Ex. I, ECF No. 24-1 at 15, 34 of 49. However, her pay summaries from 2014 and 2015 show that she made about the same amount of money and worked very close to the same hours in 2014 and 2015. *See* Burke Dep. 91:12-17, ECF No. 24-1; Def.'s Ex. 10, ECF No. 24-1 at 43-44 of 49.[3]

---

[3] Plaintiff asserts that her hours were restored after she complained, but new and younger scribes' hours were not cut, but increased. *See* Pl.'s Resp. ¶ 34, ECF No. 28. Plaintiff, however, does not cite admissible evidence in support of her assertion that younger scribes' hours increased, so the Court cannot rely on it.

6

Plaintiff never received any complaints regarding her work performance from doctors or co-workers while employed with HPP. Burke Aff. ¶ 18, ECF No. 28-3. She trained most, if not all, of the newly hired scribes, including Cotter, for HPP at the Albuquerque location for the majority of her employment with HPP. *Id.* ¶¶ 19-20.

Schumacher Clinical Services bought HPP in August 2015. Def.'s UF ¶ 36, ECF No. 24. On August 3, 2015, Cotter applied for and received a position as a Medical Scribe Trainer, a promotion in a travel trainer role. *See* Def.'s UF ¶ 41, ECF No. 24; Def.'s Ex. 4K, ECF No. 24-1 at 35 of 49. Plaintiff was never made aware of a training position. Burke Aff. ¶ 21, ECF No. 28-3. She did not apply for the traveler trainer position. Lafayette Decl. ¶ 29, ECF No. 24-1.

On August 31, 2015, Defendant was notified it lost its contract with Lovelace to provide scribe services to the Lovelace facilities in Albuquerque effective December 31, 2015. *See* Def.'s UF ¶ 37, ECF No. 24; Def.'s Ex. 13A, ECF No. 34-1. Plaintiff, along with all other scribes working for Defendant in Albuquerque were terminated on December 31, 2015. *See* Lafayette Decl. ¶ 25, ECF No. 24-1; Falk Decl. ¶ 4 & Def.'s Ex. 13B, ECF No. 34-1. At the time of her termination, Lafayette was not Plaintiff's supervisor. Def.'s UF ¶ 44, ECF No. 24.

Plaintiff did not apply for any other position within HPP. Burke Dep. 93:19-25, ECF No. 24-1. No scribe working in Albuquerque for Defendant was made an offer to transfer to another location, nor was any scribe transferred to another location when Defendant lost its contract. Lafayette Decl. ¶ 27, ECF No. 24-1. Cotter stayed with HPP even after Defendant lost its contract. *See* Burke Dep. 90:23-91:2, ECF No. 24-1. On October 31, 2016, Plaintiff filed her Charge of Discrimination with the Human Rights Bureau, which she signed on October 27, 2016. Def.'s UF ¶ 45, ECF No. 24, Def.'s Ex. 12, ECF No. 24-1 at 49 of 49. She subsequently filed suit under the New Mexico Human Rights Act for age discrimination against Defendant TSG Resources, Inc.,

doing business as Schumacher Clinical Partners, (hereinafter "Defendant") for "unjustly disciplining her, reducing her work hours, failing to transfer her, and subjecting her to a hostile work environment." Second Am. Compl. ¶¶ 26-27, ECF No. 26.

## II. STANDARD

On a motion for summary judgment, the moving party initially bears the burden of showing that no genuine issue of material fact exists. *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for trial. *Id.* The nonmoving party must go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995). Only disputes of facts that might affect the outcome of the case will properly preclude the entry of summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *See id.* at 248.

## III. LEGAL ANALYSIS

The New Mexico Human Rights Act ("NMHRA") makes it unlawful for an employer "to discharge … or to discriminate in matters of compensation, terms, conditions or privileges of employment against any person otherwise qualified because of … age." N.M. Stat. Ann. § 28-1-7(A). New Mexico courts frequently look to federal law for guidance when analyzing NMHRA claims. *See*, *e.g.*, *Ulibarri v. State of New Mexico Corrections Academy*, 2006-NMSC-009, ¶ 11, 131 P.3d 43; *Smith v. FDC Corp.*, 109 N.M. 514, 517-18, 787 P.2d 433, 436-37 (N.M. 1990)

(following guidance of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), when examining race and age discrimination claims under NMHRA).

### A. Plaintiff's pre-termination claims are all time-barred

The NMHRA requires that a charge of discrimination be filed within 300 days of the alleged unlawful employment practice. *Ulibarri*, 2006-NMSC-009, ¶ 8 (citing N.M. Stat. Ann. § 28-1-10(A) (2005)). Defendant asserts that Plaintiff signed her charge of discrimination on October 27, 2016, and that 300 days before that date is December 31, 2015. Def.'s Mot. 11, ECF No. 24. Defendant argues that the only event that arguably falls within the statute of limitations is Plaintiff's termination, and thus, she is barred from bringing claims based on any of the disciplinary actions that occurred before December 31, 2015.

Plaintiff does not dispute the applicable date but asserts that her age discrimination claim based on her termination and her hostile work environment claim are not time-barred. Plaintiff contends that her termination was an act in a series of hostile acts composing her hostile work environment claim. Plaintiff also clarified that she "is not alleging that the discipline and reduced hours are separate discrete acts." Pl.'s Resp. 15, ECF No. 28. Instead, she asserts the discipline and reduced hours are "evidence of a hostile work environment and differential treatment leading up to her termination." *Id.* The parties agree that Plaintiff's termination claim is not time-barred, so the Court will consider the merits of that claim below and turn next to the timeliness of Plaintiff's hostile work environment claim.

Separate, discrete claims based on acts occurring before December 31, 2015 are time-barred. *See National R.R. Passenger Corp v. Morgan*, 536 U.S. 101, 113 (2002) ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging

that act."). An employee nevertheless may use prior acts as background evidence in support of a timely claim. *Id.* Hostile work environment claims, in contrast, are composed of a series of separate acts that together constitute an unlawful employment practice. *Id.* at 117. "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id. See also Ulibarri*, 2006-NMSC-009, ¶¶ 10-11 (adopting similar approach as *Morgan* when determining time limitations under NMHRA). To determine whether acts are part of the same hostile work environment, courts should consider the type of acts, the frequency of the acts, and the perpetrator of the acts. *Duncan v. Manager, Dept. of Safety, City and County of Denver*, 397 F.3d 1300, 1309 (10th Cir. 2005) (citing *Morgan*, 536 U.S. at 120).

Plaintiff's hostile work environment claim is based on the actions of Lafayette. Plaintiff believed Lafayette's repeated attempts to make her work night shifts and weekends, and the documented warnings that resulted when she refused, were hostile, harassing and designed to make her quit. Plaintiff does not claim that anyone other than Lafayette harassed her. Lafayette, however, was no longer her supervisor at the time she was terminated. Moreover, it is undisputed she was terminated with all the other scribes when Defendant lost its contract with Lovelace to provide scribe services, an event different in kind from the prior alleged harassment by Lafayette. Lafayette had no role in her termination. Even construing the record in Plaintiff's favor, her termination was a completely separate event, having no relationship to the other alleged acts comprising her hostile work environment claim.

Although Plaintiff tries to link her termination to the failure to transfer her, it is undisputed that Cotter took the trainer position before the termination date. The failure to transfer or promote Plaintiff into that position is therefore also untimely and barred by the 300-day deadline. For all

the foregoing reasons, Plaintiff's hostile work environment claim is barred by the limitation period in the NMHRA.

### B. Defendant is entitled to summary judgment on Plaintiff's age discrimination claim

New Mexico courts have used the *McDonnell-Douglas* test as a framework to use in analyzing age discrimination claims. *Cates v. Regents of New Mexico Institute of Min. & Technology*, 1998-NMSC-002, ¶ 15, 124 N.M. 633. To make a prima facie case of age discrimination, Plaintiff must prove (1) she is over 40 years old; (2) she was qualified to continue in the position; (3) her employment was terminated; and (4) her position was filled by someone not a member of the protected class. *Id.* ¶¶ 17-18. In cases where the plaintiff and replacement are close in age, courts should look to the surrounding circumstances to determine if plaintiff has raised an inference of discrimination, in other words, if the plaintiff lost out because of her age. *See id.* ¶ 19. *See also Bennett v. Windstream Communications, Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015) ("A prima facie case generally requires a plaintiff to show, by a preponderance of the evidence, that she is a member of a protected class, she suffered an adverse employment action, and the challenged action occurred under circumstances giving rise to an inference of discrimination."). In a reduction-in-force case, the plaintiff may satisfy the fourth factor by submitting evidence that plaintiff was treated less favorably than younger employees. *Cates*, 1998-NMSC-002, ¶ 20.

"Once a plaintiff establishes a prima facie case, the burden shifts to the employer to show a legitimate non-discriminatory reason for its decision." *Id.* ¶ 16. If the defendant produces a reason, the burden shifts to the plaintiff to show either direct evidence of age discrimination or that the defendant's reasons for dismissal were pretext for age discrimination. *Id.*

In this case, there is no direct evidence of age discrimination, so the Court will use the *McDonnell-Douglas* framework. Only the fourth factor in the prima facie test is disputed. There is no information of who replaced Plaintiff because it is undisputed all scribes lost positions because the company lost its contract for scribe services with Lovelace. Plaintiff nonetheless argues that she was not given any opportunity to transfer, while Defendant offered a transfer position to another younger scribe. The undisputed evidence, however, reveals that Cotter had previously taken a position of traveling trainer before Defendant lost its contract and terminated all scribe positions. Cotter was therefore not similarly situated to Plaintiff. Moreover, it is undisputed Plaintiff never applied for the position or any other position with Defendant. Nor was any other medical scribe transferred.

Plaintiff argues that she was treated less favorably than younger scribes because Lafayette scheduled her night shifts, sent her repeated emails about working night shifts, wrote her up for not working night shifts, and reduced her hours, while he catered to and accommodated younger scribes' work schedules and increased the hours of younger scribes. She asserts that this differential treatment led up to her termination. As discussed *supra*, Plaintiff did not submit admissible evidence based on personal knowledge to support her allegations that Lafayette treated younger scribes more favorably. She therefore has no evidence that the disputes she had with Lafayette with work schedules occurred under circumstances giving rise to an inference of age-based animus. Nor does the record indicate any link between the conflict with Lafayette and her termination.

Next, Plaintiff points to the fact that she was temporarily assigned job duties to train doctors on an EMR system while she never witnessed any other younger scribe being assigned this job duty. The temporary assignment of EMR training, which Defendant stopped after Plaintiff

complained, does not amount to an unfavorable change of duty that suggests age-based animus. Plaintiff has not produced enough evidence for a reasonable jury to conclude that she was terminated because of her age. Accordingly, Plaintiff has failed to meet her burden of establishing a prima face case and Defendant is entitled to summary judgment on the claim.

Furthermore, even if Plaintiff satisfied the prima facie case, Defendant has produced a legitimate non-discriminatory reason for Plaintiff's dismissal – Defendant lost the contract for scribe services with Lovelace and terminated the employment of all scribes. Plaintiff argues that circumstantial evidence shows Defendant's reason is a pretext because it could have offered her an opportunity to transfer. As discussed above, Plaintiff did not submit admissible evidence that Lafayette treated similarly situated younger employees more favorably. Nor does the evidence show that Plaintiff was similarly situated to Cotter who took a position of traveling trainer before Defendant lost its contract for scribe services with Lovelace. Nor is there any evidence that Defendant gave similarly situated younger medical scribes notice of transfer opportunities but did not give Plaintiff those same opportunities.

Plaintiff contends that Defendant's reasons for disciplining her is evidence of pretext. The parties dispute whether the oral agreement not to work nights was enforceable. Defendant contends that the oral agreement for a permanent accommodation of not working nights is subject to the statute of frauds. In New Mexico, agreements not to be performed within one year are within the statute of frauds and void if not in writing. *See Skarda v. Skarda*, 1975-NMSC-028, ¶ 21, 87 N.M. 497. Plaintiff's oral agreement for permanent accommodation of nights off was therefore unenforceable. *Cf. Morgan v. City and County of Denver*, No. 10-cv-00157-REB-BNB, 2010 WL 5811831, at *6 (D. Colo. Dec. 29, 2010) ("The oral agreement for a permanent accommodation in the form of Saturdays off, if it existed at all, is unenforceable under the Colorado statute of

frauds."). Even if Defendant should have honored that agreement, and failed to do so, the resulting dispute was due to the difference of opinion regarding the continued enforceability of the verbal agreement between Plaintiff and Hartnett. There is no evidence tying the dispute to age-based animus against Plaintiff. Plaintiff has not produced admissible evidence that Defendant's reason for terminating her was pretext for age discrimination.

For all the foregoing reasons, no reasonable jury, viewing the evidence in the light most favorable to Plaintiff, could conclude her employment termination was because of her age. Defendant is entitled to summary judgment on Plaintiff's age discrimination claim.

### C. Defendant is entitled to summary judgment on Plaintiff's hostile work environment claim

Even if Plaintiff's hostile work environment claim were not time-barred, Defendant would be entitled to summary judgment. To establish a hostile work environment claim, the plaintiff must show her employer created an environment in which the offensive conduct has the purpose or effect of unreasonably interfering with her work or was intimidating, hostile, or offensive. *Ulibarri*, 2006-NMSC-009, ¶ 12. When determining whether the environment was hostile or abusive, a court looks at the totality of the circumstances, including the frequency of the conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and if it unreasonably interferes with an employee's work performance. *Id.* It must be subjectively hostile, and a reasonable person must find it hostile or abusive. *Id.*

In this case, no jury examining the evidence in the light most favorable to Plaintiff could conclude she was subject to severe or pervasive harassment. Plaintiff claims that only Lafayette harassed her. Lafayette was responsible for scheduling Plaintiff's time from April through September 2014, during which time they only saw one another approximately four times. They disagreed as to whether Plaintiff had to follow the company policy requiring employees to work

night shifts. Twice during that period, Lafayette was rude, angry, and raised his voice at Plaintiff in the ER. These two incidents lasted between one and five minutes, he never touched her during the incidents, and other people were present in the ER at the time they occurred. In a third meeting, Plaintiff found Lafayette unprofessional because he was vague about the purpose and content of the meeting and did not tell her in advance that a vice president would be at the meeting via telephone to discuss their scheduling dispute. Lafayette also sent her emails about working nights and issued written warnings when she did not work night shifts for which she was scheduled. These incidents, in total, do not create a sufficiently intimidating, hostile, or abusive working environment to establish a NMHRA claim. *Cf. Ulibarri*, 2006-NMSC-009, ¶ 13 (holding that harassment was not sufficiently severe and pervasive to support NMHRA claim where over period of two months, superior told Plaintiff he found her attractive and asked on one occasion if she was interested in relationship).

A plaintiff must also show that the hostile work environment stemmed from age animus. *See Smith*, 109 N.M. at 517 (stating that NMHRA makes it unlawful for employer to discriminate on basis of age); *Holmes v. Regents of Univ. of Colorado*, 176 F.3d 488, at *7 (10th Cir. May 7, 1999) (unpublished) (explaining that plaintiff alleging hostile work environment under ADEA must show that harassment was pervasive or severe enough to alter terms, conditions, or privileges of employment and that harassment stemmed from age-related animus). The harassment of which Plaintiff complains arose from disagreements with Lafayette regarding working night shifts and her hours. For all the reasons given above, no jury examining the evidence in the light most favorable to Plaintiff could conclude the harassment was because of her age. Accordingly, Defendant is entitled to summary judgment on Plaintiff's hostile work environment claim on this alternative ground.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment and Memorandum in Support (**ECF No. 24**) is **GRANTED**. Defendant is entitled to summary judgment on all claims in this case and all claims are **DISMISSED WITH PREJUDICE**.

_____
**UNITED STATES DISTRICT JUDGE**